TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald
John N. McClain III
John C. Gallego

*and*

GARFUNKEL WILD, P.C.
900 Stewart Avenue
Garden City, New York 11530
(516) 393-2200
Burton S. Weston
Kevin Donoghue

*Counsel to Blakemore Investments LLC*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                             :
In re:                                                       :        Chapter 7
                                                             :
LAW OFFICES OF EDWARD J. LAKE, P.C.,                         :        Case No. 25-74584 (LAS)
d/b/a THE LAKE LAW FIRM,                                     :
                                                             :
                                                             :
                        Debtor.                              :
                                                             :
-------------------------------------------------------------x
                                                             :
In re:                                                       :        Chapter 7
                                                             :
LAKE LAW FIRM LLC,                                           :        Case No. 25-74585 (LAS)
                                                             :
                                                             :
                        Debtor.                              :
                                                             :
-------------------------------------------------------------x

## MOTION FOR AN ORDER TO ALLOW RECEIVER TO CONTINUE IN CONTROL OF DEBTOR PROPERTY PURSUANT TO STIPULATED RECEIVER-APPOINTMENT ORDER AND EXCUSE COMPLIANCE WITH SECTIONS 543(a) AND 543(b)(1) UNTIL THE EARLIER OF (I) ENTRY OF <u>AN ORDER FOR RELIEF OR (II) THE APPOINTMENT OF AN INTERIM TRUSTEE</u>

Blakemore Investments LLC, the second largest creditor herein with claims in excess of $15 million ("Blakemore"), by and through its undersigned attorneys, Togut, Segal & Segal, LLP and Garfunkel Wild, P.C., hereby makes this motion (the "Motion") for an order, substantially in the form attached hereto as **Exhibit A**, permitting Salvatore LaMonica, Esq., the State Court Receiver ("LaMonica" or the "Receiver") appointed in furtherance of a Stipulation and Order entered on October 30, 2025 by the Hon. David T. Reilly, J.S.C. (the "Stipulated Receiver Order") to continue in possession, custody, and control of the Debtor's property, which Receiver was consensually appointed to safeguard for the benefit of the creditors of Law Offices of Edward J. Lake, P.C., d/b/a The Lake Law Firm ("Lake Law" or the "Debtor"), and to excuse his compliance with sections 543(a) and 543(b) of the Bankruptcy Code until the earlier of (1) entry of an order for relief, or (2) the appointment of an interim Chapter 7 trustee.  In the event the Court were inclined to direct the appointment of an interim Trustee, Blakemore would urge the U.S. Trustee to appoint LaMonica, an experienced EDNY and SDNY Chapter 7 trustee of almost 20 years and a restructuring attorney of more than 30 years, to that role.

In support of the Motion, Blakemore submits: (1) the *Affirmation in Support of Plaintiff's Order to Show Cause for Immediate Relief* and attachments thereto, filed in the Supreme Court of Suffolk County, New York (collectively, the "State-Court Batchelor Affirmation" filed in the "State Court"), attached hereto as **Exhibit B**; and (2) the *Declaration of Craig Batchelor* in support of the Motion and attachments thereto (the "Batchelor Declaration"), attached hereto as **Exhibit C**, and respectfully states:

2

## PRELIMINARY STATEMENT[1]

1.      The Debtor is what is known as a "feeder firm" in the mass-tort-claims arena.  It does not litigate its clients' claims itself, instead having other firms handle the litigation with each firm entitled to a share of the recoveries.  Lake Law, through Lake and an affiliated company, procured clients through nationwide advertising and solicitation efforts funded, in part, from millions of dollars provided by third parties.  The Debtor also markets assistance with the preparation and prosecution of claims for recovery of tax overpayments under the Employee Retention Tax Credit ("ERTC") program.

2.      Lake Law had virtually no income in 2024 and its operating expenses were paid from new advances made by certain of the Petitioning Creditors starting in January 2024 and by Blakemore starting in the summer of 2024.  Blakemore originally provided Lake Law $15 million in exchange for future expected payments from tax refunds pursuant to the ERTC program, secured by certain ERTC claims, the proceeds and processing agreements related thereto, accounts pertaining to ERTC proceeds, and all other assets or proceeds related to the foregoing.  Blakemore has provided an additional approximately $1.1 million in funding on a secured basis since July 2024 to assist Lake Law with paying its operating expenses, including staff salaries and a monthly stipend for Lake.

3.      The Debtor's founder and sole owner, Edward Lake, ("Lake") has engaged in long-running gross mismanagement, incompetence, and misconduct which has rendered the Debtor insolvent and unable to meet its financial obligations, including those owed to Blakemore. Notwithstanding Blakemore's economic support, and a go-forward settlement agreement negotiated over many months and entered into in May

---

[1]     Capitalized terms used and not defined herein will have the meanings ascribed to them elsewhere within the Motion.

2025 among Blakemore, Lake, Lake Law, and its largest creditor, Titan Law Group (with its affiliated entities, "Titan") (who, along with its principals, are among the Petitioning Creditors), Lake unilaterally breached that agreement by, among other things, terminating, without any notice to Blakemore or Titan, the independent Chief Restructuring Officer ("CRO") who had control over and disbursement authority for the Lake Law bank accounts. The CRO had been inserted as a condition of the settlement agreement to provide transparency and protection for Blakemore and Titan who continued to advance funds. His surreptitious discharge by Lake was further proof that he is incapable of being a fiduciary for the Debtor's creditors.

4.     Compounding matters, Lake has now subjected the Debtor to lawsuits pending in state court which seek, among other things, millions of dollars from Lake Law and from Lake individually. Lake has filed a complaint in the same state court against Titan and its principals.

5.     A short time ago, there was cooperation and an agreement among the Debtor's two largest creditors (holding in excess of 95 percent of the claims against the Debtor) and Lake as to the orderly wind down of the Debtor's mass-tort and ERTC-client claims and the distribution of proceeds earned by Lake Law, but now there is value-destructive litigation, no cooperation among the parties, and uncertainty for Lake Law's creditors.

6.     In light of Lake terminating the CRO (thus eliminating the independent fiduciary that creditors had relied upon for transparency) and an outbreak of litigation threatening to drain valuable assets, Blakemore filed its own complaint against Lake and Lake Law in New York State court seeking the appointment of a receiver to take control of Lake Law's bank accounts and other property to ensure that its property (including Blakemore's cash collateral) would not be misappropriated or wasted in Lake's hands.

Before the hearing to consider emergency relief, Lake agreed and stipulated to LaMonica's appointment as Receiver pursuant to Justice Reilly's November 5, 2025 Stipulated Receiver Order. The Receiver immediately took exclusive control over Lake Law's bank accounts and other property, and he has familiarized himself with the Debtor's operations and employees.

7.      Thus, Blakemore has regained some measure of transparency and comfort as LaMonica had brought stability and security to a chaotic and uncertain situation. Accordingly, Blakemore wishes to ensure that the *status quo* be maintained with the Receiver continuing to perform his duties on behalf of the Debtor in accordance with the Stipulated Receiver Order.

8.      While the involuntary Chapter 7 bankruptcy petition filed against Lake Law on November 24, 2025 does not facially preclude the Receiver from continuing to exercise control over the Debtor's receipts, disbursements, and bank accounts and other property, as he had pursuant to the Stipulated Receiver Order, Section 543(b) of the Bankruptcy Code requires the Receiver (as a Custodian) to relinquish control over the Debtor's property to the trustee once appointed and, in the interim, Section 543(a) arguably restricts the Receiver's ability to make disbursements on behalf of the Debtor unless otherwise authorized by this Court. *See* 11 U.S.C. § 543(a), (b)(1). While Section 543(b)(1) only requires a Custodian to turn debtor property over to a "trustee," and one has not yet been appointed—meaning that the Receiver is not currently obligated to relinquish control—the involuntary petition potentially threatens the efficacy of the Stipulated Receiver Order that Lake/the Debtor, Blakemore, and Justice Reilly all endorsed one month ago, and could upset the *status quo* and stability that the appointment of the Receiver achieved.

9.      Because it is in the best interests of the Debtor's creditors that the Receiver remain in place until a trustee is appointed for the Debtor, Blakemore makes this Motion for an Order that allows the Receiver to remain in place and proceed under the Stipulated Receiver Order until the earlier of the entry of an order for relief or the appointment on an interim trustee.  Blakemore has reviewed this Motion and the relief sought herein with LaMonica who has no objection to the same and who is willing to continue to act as Receiver unless and until he is otherwise directed by the Court.

## PARTIES

10.      Movant Blakemore is a Delaware limited liability company with an address at 251 Little Falls Drive, Wilmington, DE 19808 in the business of litigation financing.

11.      Upon information and belief, Debtor Lake Law Firm LLC is a New York limited liability company with an address at 270 West Main Street, Suite 3, Sayville, New York 11782, which focuses its law practice primarily on representing individual plaintiffs pursuing mass-tort and other plaintiff-based claims, including those under the ERTC program.  As stated above, the Debtor's founder and sole owner Lake, is a New York-licensed attorney who resides in Del Ray Beach Florida.

## JURISDICTION AND VENUE

12.      This Court has jurisdiction over the Motion pursuant 28 U.S.C. §§ 157 and 1334; Administrative Order No. 264 of the United States District Court for the Eastern District of New York (titled "In the Matter of The Referral of Matters to the Bankruptcy Judges") (Weinstein, C.J.), dated August 28, 1986; and Administrative Order No. 601 of the United States District Court for the Eastern District of New York (Amon, C.J.), dated December 5, 2012.

13.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), and/or (G).

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1408 because there is a Chapter 7 case concerning the Debtor pending in this Court.

15.     The statutory predicate for the relief sought herein are sections 105(a) and 543(d)(1) of the Bankruptcy Code.

## FACTUAL BACKGROUND

### A.     The Parties' Relationship

16.     Blakemore is a litigation capital provider.   On December 14, 2022, Blakemore and the Debtor entered into a Capital Provision Agreement (the "CPA"), pursuant to which Blakemore advanced funds to the Debtor in exchange for future expected payments from tax refunds pursuant to the ERTC program, administered by the Debtor on behalf of its client taxpayers.  Blakemore advanced $15 million to the Debtor.

17.     The Debtor's obligations under the CPA are secured by a Security Agreement, dated December 14, 2022, pursuant to which the Debtor granted Blakemore a first-priority security interest in certain ERTC claims, the proceeds and any processing agreements related thereto, the Escrow Account (defined below), and all other assets or proceeds related to the foregoing (the "ERTC Collateral").

18.     Blakemore perfected its security interest in the ERTC Collateral by filing a UCC-1 financing statement on December 16, 2022.

19.     Under the CPA, Lake agreed to be jointly and severally liable to Blakemore for the Debtor's performance and payment obligations under the CPA (the "Personal Guarantee").   In addition, Blakemore and the Debtor executed an Escrow Agreement, dated January 17, 2023 (the "Escrow Agreement"), which required that the Debtor deposit proceeds from the ERTC Collateral into an escrow account (the "Escrow Account").

20.     The Debtor failed to obtain and process the required ERTC claims due to Blakemore under the CPA.

21.     As a result, on November 7, 2023, Blakemore served a Notice of Exercise of Rights under the CPA on the Debtor, which demanded that the Debtor pay the penalty amount set forth in the CPA, totaling $11,750,000 (the "Penalty Amount").

22.     On March 25, 2024, Blakemore served a Notice of Default under the CPA on the Debtor because the Debtor had failed to pay the Penalty Amount.  That same date, Blakemore served a Notice of Joint and Several Liability on Lake, confirming that Blakemore did not waive its rights under the Personal Guarantee.

**B.     Blakemore's Pre-Petition Funding of Lake Law and the Workout Agreement**

23.     In April 2024, Titan—which had themselves advanced approximately $30 million to Lake Law or its advertising procurement affiliate Persist Communications—began discussions with Blakemore about stabilizing the Debtor's operations and implementing an out-of-court workout to address the Debtor's enormous liabilities and lack of any revenue.   Titan and Blakemore (the "Creditor Parties") ultimately reached an agreement on a sharing formula to fund Lake Law's operations pursuant to a pre-approved budget provided an independent financial advisor was engaged by Lake for Lake Law (the "Go-Forward Financing") until such time as the Lake Law generated enough unencumbered revenue to fund its operations.   The Creditor Parties also sought to negotiate a restructuring support agreement with Lake, with the intent of ultimately obtaining the support of the Debtor's other creditors which collectively were few in number (fewer than 20) and in the aggregate were owed approximately $5 million based on information provided by Lake Law.

24.     The Go-Forward Financing was essential if the Debtor was to avoid collapse, service its clients, preserve the value of secured creditor collateral, and maximize the recoveries for all creditors.   Lake's instability and mismanagement of the Debtor demonstrated to Blakemore that Lake was (and is) unable to serve as a fiduciary

for the Debtor's creditors.  The appointment of an independent fiduciary to control the Debtor's bank accounts was therefore made an indispensable condition of the Creditor Parties' agreement to provide the Go-Forward Financing.

25.    On or about July 17, 2024, the Debtor retained Getzler Henrich & Associates LLC ("Getzler") as its financial restructuring advisor and Mark Samson, a Managing Director at Getzler was tasked to lead the engagement.  On August 15, 2024, Blakemore and the Debtor amended the Escrow Agreement to add Mr. Samson as a company representative of the Debtor.

26.    For several months thereafter Mr. Samson stabilized the firm by, among other things, providing transparency and reliable information to creditors, formulating budgets acceptable to the Creditor Parties, making disbursements, reviewing Lake Law's claim-recovery projections, and reconciling claims asserted against the Law Firm. Simultaneously, the Creditor Parties engaged in negotiations towards a restructuring support agreement that would form the basis of a workout agreement for all of Lake Law's creditors (and if a bankruptcy case became necessary, the foundation of a prearranged or prepackaged bankruptcy).

27.    On or about March 13, 2025, the Creditor Parties executed a Term Sheet (the "Term Sheet"), pursuant to which the terms of Go-Forward Financing and a comprehensive restructuring and recovery waterfall for all creditors of the Debtor were agreed upon.

28.    Thereafter, on May 8, 2025, Lake and Lake Law entered into an Addendum with the Creditor Parties (the "Addendum" and, together with the Term Sheet, the "Agreement").  Pursuant to the Addendum, Lake and the Debtor both agreed to be bound by the terms of the Term Sheet, as well as by the terms of the Addendum itself. *See* State-Court Batchelor Aff., Ex. B (b).

29.    The Addendum required, among other things, that Lake take affirmative steps to ensure that Samson be appointed as Chief Restructuring Officer of Lake Law to elevate him officially to an independent fiduciary position "with sole authority and control over the [Debtor]'s receipts, disbursements and bank accounts":

> Immediately following the execution of this Addendum, Lake shall take all actions and cooperate with any steps necessary to have Mark Samson, of Getzler Henrich & Associates LLC, the [Debtor]'s Financial Advisors, approved as the Chief Restructuring Officer of the [Debtor] with sole authority and control over the [Debtor]'s receipts, disbursements and bank accounts.

*Id.* at (c).

30.    The Addendum also provided that the Creditor Parties would pay Lake a salary, despite the fact that the Debtor did not have any unencumbered revenue from which to pay Lake a salary itself, although the Creditor Parties reserved their rights to revoke their commitments to funding for that purpose. *Id.* at (d). In turn, Lake agreed to cooperate with Titan and Blakemore in good faith. *Id.* at (i). Initially, the Creditor Parties agreed to pay Lake $15,000 per month but it was later increased to $30,000 at his request in order for him to make payments on his personal obligations to the taxing authorities.

31.    Finally and importantly, the Addendum also provided that if Lake were to breach any term of the Term Sheet or Addendum, Blakemore or Titan could have a receiver appointed or institute bankruptcy proceedings, and that Lake would consent to such actions:

> In the event Lake breaches any terms of the Term Sheet or this Addendum, Titan Law Group and Blakemore, as the case may be, *are authorized to seek the appointment of a receiver or effectuate any insolvency or bankruptcy proceeding*, and Lake shall be deemed to have consented to such appointment or proceeding.

*Id.* at (j) (emphasis added).

32.　　As of October 8, 2025, Blakemore had advanced the Debtor approximately $1.1 million in Go-Forward Financing pursuant to the Term Sheet and Addendum.

**C.　The Debtor's and Lake's Breaches and Other Misconduct Contributing to the Debtor's Insolvency**

33.　　Notwithstanding the Creditor Parties abiding by the Agreement, including having provided the Go-Forward Financing and paid a significant salary to Lake, Lake refused to advance the contemplated restructuring after the Addendum was executed, inconsistent with Lake's obligation under the Addendum to cooperate with the Creditor Parties in good faith.

34.　　Rather than cooperate with the Creditor Parties, Lake—surreptitiously and without any prior discussion with or notice to the Creditor Parties—terminated Mr. Samson and demoted Lake Law's long time acting Chief Executive Officer (who is also a significant creditor of the Debtor), reasserted control over the Debtor's bank accounts, and continued his pattern of gross mismanagement of the insolvent Debtor, including attempting to appropriate Debtor funds for his own personal benefit.  Further, upon information and belief, Lake wrongfully instructed Mr. Samson not to inform the Creditor Parties of his termination to further Lake's scheme to hide that material breach of the Agreement from Blakemore.

35.　　Because of Lake's general mismanagement and egregious breaches of the Agreement, on October 12, 2025, in a joint letter from Titan and Blakemore's respective counsel, the Debtor and Lake were given notice of their breach of the terms of the Agreement and provided five (5) business days to cure the breaches.  *See* State-Court Batchelor Aff., Ex. C.  Lake did not cure the breaches.

36.　　On or about October 15, 2025, upon information and belief, Lake made unauthorized changes to the Debtor's banking authorizations, making himself and/or

his agent the signatory on accounts holding funds for the benefit of Blakemore and Titan. On October 16, 2025, the Creditor Parties, through counsel, sent another joint letter to the Debtor and Lake, providing notice that any disbursements made from the Debtor's bank accounts by anyone other than an independent fiduciary would be a breach of the Agreement and violate an indispensable condition of the Go-Forward Financing. *See* State-Court Batchelor Aff., Ex. D.

37.     These most recent breaches of the Agreement are not the only evidence of Lake's mismanagement, incompetence, and malfeasance in connection with the Debtor's management and reckless disregard for the interests of creditors like Blakemore. Additional breaches and failures to comply with duties to creditors include the following:

a)     Despite having an agreed-upon budget for the past few months, without explanation or discussion in advance, a not-insignificant $5,000 line item appeared on a funding request for travel to Las Vegas.  When asked, the Debtor, through the Chief Restructuring Officer, responded in sum and substance that the request was for travel for Lake so that he could go to an industry conference to "maintain relationships."

b)     Lake sought to pay the credit card bills of the wife of one of his employees totaling approximately $106,000, stating that the charges were for expenses of the Debtor.

c)     Lake borrowed approximately $117,000 as a "payroll loan" from an employee at the Debtor that Lake recently demoted.

d)     Lake made payments on his personal credit card with funds advanced to the Debtor by Titan and Blakemore, and the balance owed on that credit card exceeded $136,000.[2]

e)     Lake sought to make payments to himself in excess of the agreed-upon salary.

f)     Lake appears to owe at least $671,469.60 to the Internal Revenue Service.

g)     Lake appears to owe approximately $100,000 to New York State.

38.     Lake never cured the aforementioned breaches of the Agreement, and none of these breaches have been excused.

---

[2]     Ultimately, the Creditor Parties agreed to fund partial payments on this credit card as part of the Go-Forward Financing in an effort to insulate the Debtor and maintain operations.

**D.    The State-Court Action and the Receiver's Appointment**

39.    On October 27, 2025, Blakemore filed a complaint (the "Complaint") against Lake Law and Lake (together, the "Defendants") in the State Court commencing *Blakemore Investments LLC v. Lake Law Firm, LLC, et al.*, Index No. 629003/2025 (N.Y. Sup. Ct., Suffolk Cty.) (the "State-Court Action").  Batchelor Decl., Ex. 1.

40.    Simultaneously, Blakemore filed a motion in the State Court seeking the appointment of a receiver (the "Receiver Motion").  Batchelor Decl., Ex. 2.

41.    After filing the Receiver Motion, Blakemore, through its counsel, contacted the Defendants' counsel to discuss the Defendants' consent to the relief sought in the Receiver Motion.  Batchelor Decl. ¶ 5.

42.    On October 28, 2025, the State Court held a status conference regarding the Receiver Motion and the Defendants reported their consent to the relief sought in the Receiver Motion.  Batchelor Decl., ¶ 6.

43.    On October 30, 2025, Blakemore filed the parties' *Stipulation and Order Resolving Motion and Appointing Temporary Receiver* (State Court Action, NYSCEF Doc. No. 16) (the "Receiver Stipulation").

44.    On October 31, 2025, Blakemore filed the *Supplemental Affirmation in Support of Plaintiff's Order to Show Cause for Immediate Relief* (State Court Action, NYSCEF Doc. No. 17) (the "Supplemental Receiver Affirmation"), wherein Blakemore requested, with the consent of the Defendants, that the State Court appoint LaMonica as the Receiver.  Batchelor Decl., Ex. 3.

45.    On October 31, 2025, Justice Reilly conducted a further conference upon receiving a letter from the Brewer Firm as counsel at that time to two of the Petitioning Creditors (Solit and Benito), seeking to delay entry of the Receiver Order for a short period.  Justice Reilly so-ordered the parties' Receiver Stipulation immediately

following the conference (State Court Action, NYSCEF Doc. No. 18).  Batchelor Decl., Ex. 4.

46.     On November 5, 2025, the State Court entered the Stipulated Receiver Order without objection  (State Court Action, NYSCEF Doc. No. 24).  Batchelor Decl., Ex. 5.

47.     Since entry of the Stipulated Receiver Order and pursuant to its terms, the Receiver has assumed control of the Debtor's bank accounts, accounts receivable, and all other property of the Debtor for the benefit of the Debtor's creditors, and he has sole authority to make disbursements for the Debtor.  Batchelor Decl., ¶ 11.  The Receiver has been and remains critical to the stabilization of the Debtor's operations, creditor confidence, and transparency, and to ensure there is an independent fiduciary at the Debtor.  Batchelor Decl., ¶ 12.

48.     The relief sought in the Motion is equally critical to preserve continuity and maintain the *status quo* for the benefit of the Debtor's creditors.  Batchelor Decl., ¶ 13.  Blakemore believes that it is also in the best interests of creditors that an Order for Relief under Chapter 7 of the Bankruptcy Code be entered for the Debtor and the U.S. Trustee consider appointing LaMonica as the interim Chapter 7 trustee.

## RELIEF REQUESTED

49.     To protect its interests and those the Debtor's other creditors, Blakemore seeks an order, substantially in the form attached hereto as **Exhibit A**, confirming that the Receiver is to continue in possession, custody, and control of the property over which the Stipulated Receiver Order gave him control, and that he is authorized to administer that property and make disbursements on behalf of the Debtor (including to payroll for the Debtor's employees who are essential) until the earlier of: (1) an order for relief being

entered; or (2) an interim Chapter 7 trustee (or other neutral fiduciary) being appointed

for the Debtor.

### BASIS FOR RELIEF REQUESTED

50.    11 U.S.C. § 543 sets forth the rights and responsibilities of a custodian—such

as a receiver appointed by a state court, *see* 11 U.S.C. § 101(11)—that is in possession of a

debtor's property when a bankruptcy case commences.

51.    As relevant here, Section 543(a) provides:

(a) A custodian with knowledge of the commencement of a case under this title
concerning the debtor may not make any disbursement from, or take any action
in the administration of property of the debtor, proceeds, product, offspring,
rents, or profits of such property, or property of the estate, in the possession,
custody, or control of such custodian, except as necessary to preserve such
property.

52.    In addition, Section 543(b)(1) provides:

(b) A custodian shall—

(1) deliver to the trustee any property of the debtor held by or
transferred to such custodian, or proceeds, product, offspring, rents,
or profits of such property, that is in such custodian's possession,
custody, or control on the date that such custodian acquires
knowledge of the commencement of the case . . .

Section 543(a) therefore generally operates to prohibit a custodian from administering or

disbursing debtor property, and 543(b)(1) generally operates to require a custodian to

turn over the debtor's property to a bankruptcy trustee (or Chapter 11 debtor-in-

possession, *see* 11 U.S.C. § 1107(a)), once the custodian learns of the commencement of a

bankruptcy case.    Notably, however, Section 543(b)(1) contemplates no turnover

obligation to an involuntary Chapter 7 debtor, which is neither a trustee nor a debtor-in-

possession.  *See In re Signature Apparel Grp. LLC*, 577 B.R. 54, 87 (Bankr. S.D.N.Y. 2017)

("The involuntary Chapter 7 gap debtor does not have the rights and powers of a trustee

even after an order for relief is entered, and cannot be compared to a debtor in possession,

which has certain vested rights."); *see also In re Higgins*, 270 B.R. 147, 153 (Bankr. S.D.N.Y. 2001) (noting that the concept of a debtor-in-possession does not apply in a Chapter 7 case).

53.     Even where—unlike here—a Section 543(b)(1) obligation exists, "[d]espite the mandate of section 543(a) and (b), section 543(d)(1) permits the bankruptcy court in its discretion to excuse a custodian's strict compliance with the turnover provisions of section 543(a) and (b), 'if the interest of creditors would be better served by permitting the custodian to continue in possession of the property.'" *In re Dill*, 163 B.R. 221, 225 (E.D.N.Y. 1994).

54.     Courts considering a Section 543(d)(1) motion to allow a receiver or other custodian to remain in control over debtor property do so with reference to the following considerations:

(1) whether there will be sufficient income to fund a successful reorganization;

(2) whether the debtor will use the turnover property for the benefit of the creditors;

(3) whether there has been mismanagement by the debtor;

(4) whether or not there are avoidance issues raised with respect to property retained by a receiver, because a receiver does not possess avoiding powers for the benefit of the estate; and

(5) the fact that the bankruptcy automatic stay has deactivated the state court receivership action.

*In re Dill*, 163 B.R. 221, 225 (E.D.N.Y. 1994); *In re Lizeric Realty Corp.*, 188 B.R. 499, 506 (Bankr. S.D.N.Y. 1995), *as amended* (Nov. 28, 1995) (substantially same).   But "[t]he interests of the debtor . . . are not part of the criteria considered when applying section 543(d)(1)." *Dill*, 163 B.R. at 225.

55.     Where—unlike here—a Section 543(b)(1) obligation exists, a Section 543(d)(1) movant bears the burden of establishing cause to excuse the custodian's

compliance with Sections 543(a) and 543(b)(1) by a preponderance of the evidence in light of the above-described *Dill* factors.  *Lizeric*, 118 B.R. at 506.  It is within the Court's discretion to grant Section 543(d)(1) relief based upon some, but not all, of the *Dill* factors.  *See Dill*, 163 B.R. at 224-27 (affirming bankruptcy court's grant of Section 543(d)(1) motion to excuse receivers from complying with Section 543(b)(1)'s turnover requirements noting (1) evidence of debtor mismanagement of subject property (including misappropriation of security deposits) and (2) secured lender had to subsidize debtor's maintenance of and necessary repairs to subject property because current operations could not adequately fund them); *In re CCN Realty Corp.*, 19 B.R. 526, 529 (Bankr. S.D.N.Y. 1982) (granting bank's motion to allow receiver to continue to control debtor property under Section 543(d)(1) to protect against threat that debtor would misuse the property, noting: "The bank is justifiably concerned that the turnover of the collected rent proceeds may be a prelude to their being frittered away.").

## ARGUMENT

### I.  The *Status Quo* Should be Maintained Pending an Order for Relief

56.    Because this is an involuntary Chapter 7 bankruptcy with no order for relief yet entered, and no interim trustee yet appointed, there is no fiduciary for the Debtor to whom the Receiver can turn over control over the Debtor's property; we are in the so-called "gap period."  *See* 11 U.S.C. § 543(b)(1) (describing custodian's obligation to deliver debtor property "to the trustee"); *Signature Apparel*, 577 B.R. at 87 ("The involuntary Chapter 7 gap debtor does not have the rights and powers of a trustee even after an order for relief is entered, and cannot be compared to a debtor in possession, which has certain vested rights."); *Higgins*, 270 B.R. at 153 (debtor-in-possession does not exist in Chapter 7 case); *cf. In re Wellesley Realty Assocs., LLC*, No. 12-16889-JNF, 2015 WL 2261680, at *13 (Bankr. D. Mass. May 11, 2015) (11 U.S.C. § 542(a)'s trustee-turnover provisions for non-

custodians "inapplicable" after debtor's property revested in the reorganized debtor pursuant to a confirmed Chapter 11 plan because "there is no longer a trustee (or debtor-in-possession) to whom property can be delivered"). Put another way, there is no Section 543(b)(1) turnover obligation that currently exists.

57.    However, to provide clarity to the Receiver and the Debtor's creditors during the "gap period," and to preserve the Debtor's assets for the benefit of all creditors, Blakemore respectfully requests that the Court enter the Proposed Order to allow the Receiver to continue in his fiduciary role and to exercise control over the Debtor's bank accounts (including to make disbursements for the Debtor as he deems necessary) and other property pursuant to the terms of the Stipulated Receiver Order.

58.    The Proposed Order provides that the Receiver will continue to administer the Debtor's funds and other property because it is in the best interests of creditors to maintain the *status quo* and excuse the Receiver's compliance with Section 543(a) of the Bankruptcy Code as the Court may do pursuant to Section 543(d)(1) of the Bankruptcy Code. Blakemore and the Debtor's creditors have relied on an independent fiduciary to make ordinary-course disbursements prior to (by the CRO) and after (by the Receiver) the Stipulated Receiver Order's entry, such as for paying the Debtor's employee salaries and to preserve cash collateral in which Blakemore (and to a limited extent, Titan), has a security interest.

**A.    The *Dill* Factors Support Allowing the Receiver to, among other things, Continue in His Fiduciary Role Pursuant to the Terms of the Stipulated Receiver Order Until an Order for Relief Is Entered**

          1.    <u>The Debtor Is Insolvent and Has Insufficient Income to Successfully Reorganize</u>

59.    At set forth in the State-Court Batchelor Affirmation, the Debtor's outstanding obligations are overwhelming and in excess of $50 million. *See* State-Court

Batchelor Aff., ¶ 13.  Blakemore advanced $15 million to the Debtor pursuant to the CPA, which remains unpaid.  *Id.* ¶ 7.  The Debtor owes Blakemore the Penalty Amount as well, which also remains unpaid.   *Id.*  ¶  9.   Further, Titan has advanced the Debtor approximately $30 million.  *Id.* ¶ 10.  While Blakemore and Titan comprise more than 95% of the Debtor's outstanding liabilities, *see id.* ¶ 13, the Debtor also owes millions more to other creditors.

60.    The Debtor's income is insufficient to repay the Debtor's obligations or fund a reorganization.  The Creditor Parties agreed to provide the Go-Forward Financing because the Debtor has long been unable to generate sufficient revenue to fund its own operations.  *See id.* ¶ 14.  Since January 2024, more than $3 million has been advanced by the Creditor Parties.  The Debtor remains unable to fund its operations in full, and none of the Go-Forward Financing has been repaid.  *See* Batchelor Decl., ¶ 12.

61.    The fact that the Debtor cannot afford a successful reorganization is an additional reason why the Court should allow the Receiver to continue in place during the "gap period."  *See Dill*, 163 B.R. at 224-27 (affirming Section 543(d)(1) relief because debtor did not produce sufficient income to maintain operations and needed secured lender's financial assistance).

2.    <u>Lake Is Likely to Misappropriate or Waste the Debtor's Funds and Other Property Which Represents Blakemore's Cash Collateral, Rather than Use the Funds/Property for the Debtor's Creditors' Benefit</u>

62.    Lake has consistently demonstrated that he is unwilling and/or unable to act in the best interests of the Debtor's creditors. Lake has consistently breached the Agreement's terms, undermining a year long effort to stabilize the Debtor's operations and create a transparent, fair structure under which the Debtor could preserve and maximize the recovery to its creditors.  *See* State-Court Batchelor Aff., ¶ 24.  Rather than

support these efforts and act for the Debtor's creditors' benefit, Lake has instead sought to fund his and his insiders' personal interests using the Debtor's creditors' funds, including those provided by Blakemore.  *See id.*; *supra* ¶ 37.  This was part of the reason the Receiver was appointed in the first place.  Lake is in deep personal debt, creating an irreconcilable conflict of interest and perverse incentives for Lake to misappropriate Debtor funds or other property for Lake's personal benefit.  *See* State-Court Batchelor Aff., ¶ 38.

62.    Where, as here, a debtor's current management has shown disregard for the debtor's obligations to its creditors, courts allow a custodian to maintain control of the debtor's property to ensure that the property in the custodian's control is used for the creditors' benefit.  *See In re Attack Props., LLC*, 478 B.R. 337, 345 (N.D. Ill. 2012) (affirming bankruptcy court grant of Section 543(d)(1) motion because the debtor's sole owner "used rent and income from the business to pay his personal expenses," demonstrating that "there was little prospect that [the owner] and [the debtor] would manage the Property for the benefit of the creditors").  And where, as here, the debtor property at issue is collateral subject to creditors' liens and there exists a dispute about whether the debtor's current management should be able to control the collateral, applying Section 543(d)(1) to maintain the *status quo* is clearly warranted.  *See In re E./Alexander Holdings, LLC*, No. BR 22-20151-PRW, 2022 WL 1529730, at *6 (Bankr. W.D.N.Y. May 12, 2022) ("the Court deferred ruling on the receiver's motion until the lift stay motion could be heard . . . [and] ordered that the receiver remain in control of the Property on an interim basis, to preserve the *status quo* and to protect [lender]'s interest in its cash collateral").  Maintaining the *status quo* and protecting the Debtor's creditors' interests—including protecting Blakemore's collateral currently in the Receiver's custody and future cash collateral

proceeds to be received by the Debtor—is precisely what Blakemore hopes to achieve through this Motion.

           3.     <u>The Debtor Has Been Grossly Mismanaged, Leading to the Receiver's Appointment and the Involuntary Petition</u>

64.     As described in the State-Court Batchelor Affirmation, Lake has grossly mismanaged the Debtor for years, and his conduct evidences a complete lack of respect for a debtor/creditor relationship and the fiduciary duties owed to creditors when a company is insolvent or in the zone of insolvency. *See* State-Court Batchelor Aff., ¶ 40.

65.     Examples of Lake's mismanagement are legion. One example is the misuse of the Debtor's funds described above. *See supra* Section I(b). Another is the fact that since at least January 2024, the Debtor has been completely beholden to the financial support of the Creditor Parties in order to fund operations, making the misuse of those funds that much more egregious. But most egregious, is Lake's secretive and Agreement-violating efforts to usurp control over the Debtor's bank accounts from the CRO. Even though it was an express condition of the Agreement by which the Creditor Parties extended and Lake/the Debtor obtained the Go-Forward Financing (and Lake's salary) that an independent fiduciary be given "sole authority and control over the [Debtor]'s receipts, disbursements and bank accounts," Addendum ¶ (c), Lake unilaterally fired the CRO, attempted to keep the termination secret from the Creditor Parties (including by making threats to the CRO), and changed the Debtor's banking authorization to give himself back control over the Debtor's bank accounts. *See* State Court Batchelor Aff., ¶ 34(i).

66.     Such egregious breaches of contract and destruction of an ongoing relationship with a source of mission-critical financing are mismanagement of the grossest sort, demonstrating yet another reason why the Receiver should stay in control

of the Debtor's bank accounts and other property. *Lizeric*, 188 B.R. at 506 (allowing receiver to maintain control over debtor's building in light of the debtor's previous mismanagement, including failure to pay taxes and address tenant complaints); *Dill*, 163 B.R. at 224 (affirming order allowing receiver to stay in place noting finding of debtor mismanagement supported by evidence that debtor's principal misappropriated and spent security deposits and that debtor could not fund necessary repairs without secured lender's financial assistance).

4.   <u>No Avoidance Claims Will Be Frustrated by the Relief Blakemore Seeks</u>

67.     While courts consider whether allowing a receiver to maintain control of debtor property will impact the estate's ability to collect on avoidance actions, because this is an involuntary bankruptcy, no avoidance powers granted under the Bankruptcy Code will vest unless and until the Court enters an order for relief.  If and when an order for relief is entered, the avoidance powers will vest in a Chapter 7 trustee, not in the Debtor.  As one court in this Circuit said when discussing the avoidance powers provided to a trustee under 11 U.S.C. § 547(b):

> Section 547(b) states that "the *trustee* may avoid [certain] transfer[s.]" (emphasis supplied).  Section 1107 of the Code states that "a debtor in possession shall have all the rights . . . and powers, and shall perform all the functions and duties . . . of a trustee serving in a case under this chapter," but there is no analogous provision applicable in Chapter 7.  Accordingly, absent a specific statutory authorization in the Bankruptcy Code, a Chapter 7 debtor does not have the power to exercise the avoidance power in section 547(b).

*Higgins*, 270 B.R. at 153.  The Debtor therefore currently lacks any avoidance powers.[3]

---

[3]     The Debtor can move under 11 U.S.C. § 706(a) to convert the involuntary Chapter 7 case to a voluntary Chapter 11 case.  If such a motion were filed, Blakemore will oppose the motion as it believes the Debtor should be in Chapter 7 with the immediate appointment of an interim trustee (preferably LaMonica).

5.     The Court Can and Should Allow the Receiver to Continue to
Perform His Duties until a Chapter 7 Trustee Is Appointed

68.     *Dill* also recognizes that Section 543(d)(1) demonstrates Congress's intent to

give courts the discretion to maintain receivers in place if doing so would further the

debtor's creditors' interests.  As the Court stated:

> [T]he Court does not accept the Debtor's argument that the automatic stay
> provisions of section 362 of the Bankruptcy Code are all that matter in the
> present inquiry.  Despite the automatic stay provisions of section 362,
> section 543(d)(1) grants the bankruptcy court discretion to excuse the
> Receiver from complying with the turnover requirements.  The Debtor's
> argument asks the Court to, in effect, read out of the Bankruptcy Code the
> operative effect of section 543(d)(1).  The Court cannot do this.  The
> Bankruptcy Code's provisions cannot be read in isolation, but must be
> interpreted in light of the remainder of the statutory scheme.  The automatic
> stay provision is just one factor a court may consider among others, when
> determining whether to excuse a custodian pursuant to section 543(d)(1).

*Dill*, 163 B.R. at 226–27 (internal citations omitted).

69.     Here, the *Dill* factors support excusing the Receiver from turning over such

control and property as it is in the best interests of creditors.  Movant respectfully submits,

therefore, that the Court preserve the *status quo* by granting the Motion.

**B.     Allowing the Receiver to Continue to Control the Debtor's Bank
Accounts and Disburse the Debtor's Funds As Necessary Is in the
Debtor's Creditors' Best Interests**

70.     The *Dill* factors described above also support allowing the Receiver to

continue to administer and disburse the Debtor's funds and other property pursuant to

the Stipulated Receiver Order—which specifically provides that the Receiver with the

authority to "preserve all assets" of the Debtor by "controlling disbursements," *see*

Batchelor Decl., Ex. 5 at 2—notwithstanding Section 543(a) of the Bankruptcy Code.  As

contemplated by Section 543(d)(1) of the Bankruptcy Code, compliance with Section

543(a) of the Bankruptcy Code should also be excused because it is clearly in the Debtor's

creditors' interests.  Allowing the Receiver to make disbursements pursuant to the

Stipulated Receiver Order, *e.g.*, by allowing him to pay the Debtor's employees' salaries, is necessary to preserve the Debtor's ability to maintain its operations and preserve the Debtor's assets for the benefit of creditors.    Preserving the Receiver's authority to administer the Debtor's bank accounts is also necessary to safeguard funds received by the Debtor that constitute Blakemore's ERTC Collateral, which, pursuant to the CPA, must be transferred to the Escrow Account.

## RESERVATION OF RIGHTS

71.    Blakemore reserves all rights, including but not limited to Blakemore's rights to seek the appointment of an interim trustee on an expedited basis pending entry of an order for relief.

## NOTICE

72.    Notice of this Motion will be given to the following parties or their counsel: (1) the Debtor; (2) the Receiver; (3) the Petitioning Creditors; (4) the U.S. Trustee; and (5) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").    Blakemore submits that, in light of the nature of the relief requested, no other or further notice need be provided.

73.    Blakemore also requests that the Court schedule a hearing on this Motion at its earliest convenience whereupon Blakemore will advise the Notice Parties.

## CONCLUSION

**WHEREFORE**, Blakemore respectfully requests that the Court: (1) enter an order, substantially in the form attached hereto as **Exhibit A**; and (2) grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
      December 1, 2025

BLAKEMORE INVESTMENTS LLC.
BY ITS ATTORNEYS
TOGUT, SEGAL & SEGAL, LLP

By:    */s/ Frank A. Oswald*
        Frank A. Oswald, Esq.
        John N. McClain, III, Esq.
        John C. Gallego, Esq.
        One Pennsylvania Plaza, Suite 3335
        New York, New York 10019
        (212) 594-5000

        and

GARFUNKEL WILD, P.C.

By:    */s/ Burton S. Weston*
        Burton S. Weston, Esq.
        Kevin Donoghue, Esq.
        900 Stewart Avenue
        Garden City, New York 11530
        (516) 393-2200